And we'll start right away with the United States v. Silver, 18-2-3-8-0. May it please the court, Mayor Fetter for Mr. Silver. Let me just start by quickly saying that we're here seeking two forms of relief. One is obviously to reverse the convictions. The other is for an extension of the bail that the panel last fall extended until seven days after submission. So that obviously requires attention. You'll get to the merits. I will proceed directly to the merits. There are two basic reasons that the conviction should be reversed here. One is the erroneous quid pro quo instructions. The other is the failure to satisfy the McDonnell Official Act requirements. I'll start with quid pro quo. On the prior appeal in this case, this court, like many others, described what the government had to prove as saying the government has to prove a quid pro quo agreement. That is not just an accidental phrasing, as the government would suggest. And what happened here is the district court, despite this court saying that, essentially, and many other courts said, well, those Have you actually ever analyzed that wording? I mean, I used it apparently, I think echoing Ganim in Rosen, but is there any case where we've analyzed this issue as opposed to just using the phrase quid pro quo agreement? Well, I think the answer is mostly yes. I think that it hasn't gotten the full analysis that's required here, because I don't think you've seen cases where courts have said that, have charged a jury like this and said, you know, without an agreement, if somebody receives money with the wrong intent, that that alone is enough to make out that element of the offense. Your argument really relates to our past decisions, but you also have an argument, I take it, that rests on the language of 201. Yes, and I would say not only this court's past decisions, but it really goes back to everything that the Supreme Court has said, going back to McCormick, where you first get this, where the court emphasizes that what's needed is a commitment by the official, or a promise to do something. So you asked the question about whether the court has analyzed it. I think the court has implicitly analyzed it, at least in all of these cases, saying repeatedly, including in Rosen, where it comes up several times, that what you have to find on the official side of things, is at a minimum that he committed himself to undertake official acts, right? It's payment for the performance or promise of performance. It's not payment that is unspecified with private internal intent that is disapproved. And McCormick, excuse me, McDonnell, there are a lot of MC cases in this line, you know, McDonnell just recently, again, the same thing, describes what the government has to prove in more than one place. I'll just pick out 136, Supreme Court of 2365. The government was required to prove that Governor McDonnell committed or agreed to commit an official act in exchange for the loans and gifts from Williams. Judge Caproni. Or agreed to commit. Or agreed to commit. And, Judge, the government objected strenuously to any notion of agreement entering into this, and Judge Caproni instructed. I guess I'm focused on the or. Right. So commit or agreed to commit. Well, yes. If somebody does something and then receives payment for it, then, sure, that also makes out the crime. Receiving payment for your, right, if the deal is you do it first and we pay you for it, sure. But either way, there is an agreement. How is that criminal? I don't understand what you mean. You mean the official just does an act and then later gets? No, no, no, no, no. I certainly do not mean that. It's a good question. So you can infer an arrangement. You can, no question, infer. The jury is permitted to infer an agreement, but important to distinguish between what the jury can infer from the evidence and what it is that is the finding that they ultimately have to make. The problem here, I mean, there are two problems. One is about. What if it's where the official says, if you give me $100, I'll do X? Right. Is that enough? Sure. So that's not really an agreement, is it? It's a promise to, well, yeah, it is. Well, but a promise is not necessarily an agreement. A promise says you do X or you give me $100 and I'll do X. That is, so at that point. That sounds to me like if we're going to talk contracts, it's unilateral in nature. Right. I think . . . So I don't . . . The problem is that we've used this, we've used, we've interchanged the word promise and agreement at times. Right. And I think the trouble is that the crime is complete at the time that the defendant or that the public official makes an indication that he or she is for some response by the payor. Well, what I would say actually is I think there are two different crimes in what you're describing that are complete at different times. Solicitation of a bribe is complete at the point where . . . Solicitation. Right. Solicitation. Huh? Right. But the actual . . . Extortion too because . . . Right. Correct. Correct. So you want the public office to extract because of the nature of your office . . .  . . . to extract from the payor the fact that if the payor does this, then the person will utilize their official office to deliver a benefit. Right. But what . . . So first of all, what is being solicited there is . . . Let me take one step back. I do think what's being described is basically contractual. We're not saying this turns on the particular technicalities of contract law. The critical part here that I think is important not to lose sight of is particularly when you lay what all the cases have required against what the instructions here said is that, you know, whether you call the promise in exchange for payment a contractual agreement or whatever it is, it is a promise. It is a commitment in exchange for, which is the language the statute uses, in exchange for. What the instructions here did was throw all of that out the window. The jury was not required to find that the defendant agreed to do anything in exchange for receipt of benefits. The jury was only required to find that he received it with intent to undertake official acts of, you know, unspecified nature. If you give me . . . We've known each other for a long time. If you give me $500 for . . . Maybe not enough. For . . . To go to dinner. But I misunderstand and view your giving me $500 as a reason to change my vote in this case. What is that? And I changed my vote. Aside from poor judgment by both of us. Aside from the codes of judicial conduct. Is that a crime under 201? It is. So from my side, no. If I don't intend to . . . I'm not worried about you. I'm worried about me. Fair enough. And from your side, if you interpret . . . No. No. It's not. Dual intent. You both have to want the same thing. So if I'm paying because I want meetings and I want you to tout my goods when you walk around the city or the state. But Loehr here thinks that you want a return on legislation. Right. And he votes because of that based on the payment. And I take that. He's not guilty of a crime. He is. He may well be guilty of a state crime. Because of your state of mind, he's not guilty of a crime. He may well be guilty of a state crime. But, again, remember, we're in a context here where, I mean, the Supreme Court has been pretty emphatic about how these laws have to be construed very conservatively. And the crime here is the crime of bribery. It's not the crime of . . . You seem to be cutting out half of 201, which is corruptly demand, seek, receive . . . Right. In exchange for . . . Right. But it's got to be in exchange for being influenced in the performance of an official act. All of the cases say . . . To his mind, it is for that. You're saying that because you didn't click your heels three times and have the same intent, that he's off the hook, right? Well . . . And it doesn't say in exchange for. It says in return for. I'm sorry. In return for. It's the cases that say it connotes an exchange. But, first of all, not to quibble, but I don't think that in terms of what you were requiring for the official, it's about the intent matching up. Because remember, like you also are going to have cases where you may have an undercover officer who doesn't intend to have something, or you have cases where somebody promises something, but doesn't intend to do it. That makes out the crime, because the crime is the promise or the performance in exchange or in return for the payment. Here, like you don't even have to get to the question of the intent being the same. That is independently a problem. But even without that problem, even if you think the intent doesn't have to be the same, Judge Caproni instructs the jury that it can all be in his mind. He didn't have to promise anything. And the government then jumps on that, and we have . . . He being Dr. Taub, you mean, or he being . . . No, no. Mr. Silver. Mr. Silver. I mean, let's get to the nub of this, because we're kind of working our way around language. But the nub of what you're really complaining about is the fact is that, from your perspective, you're saying that it's hard to identify . . . that the failure to identify what Silver was expected to do, other than the HCRA grants in the context of Dr. Staub or Taub, is open-ended to such a degree that it's hard . . . that there's nothing there for which . . . The language was specific opportunities as they arose. The stream of benefits kind of argument. That's where the rubber meets the road for you as to the Taub allegations, right? Well, I apologize because I see I'm running way over. But it's actually . . . there . . . it's well more than that. That is . . . excuse me. I'm trying to . . . I'm trying to . . . I want to . . . Start small and . . . I know. So, to me . . . to me, the biggest problem on, let's say, on the Taub stuff . . . I mean, aside from the fact that this whole thing is built on an attempt to convict him for conduct outside the statute, that is not . . . you only get into that later on harmlessness. But . . . All right. Let's go back. Let me go back to square one as to Taub. Stop. Yeah. There's evidence in the record of a clear use of an intermediary between Speaker Silver and Dr. Taub that there was a connection. Both understood. Let's take your best case. Both understood a connection between legislative grants, healthcare-related grants to Taub's research center and referral fees to Weitz and Lutzenberg to which Silver would benefit, or referrals of clients to Weitz and Lutzenberg which Silver would benefit. There's clear showing of that, correct? There is certainly evidence from which a jury could find that. The problem, of course, is that it's all outside the statute of limitations. All save one payment. That payment can't . . . Well, now we're going to get to that, what that payment means. But all save one payment is outside the statute of limitations. Right. Right. And so as to the Taub-Silver relationship . . . Right. Someone has . . . we have to be able to . . . the crime has to continue or the fit within the bribery and the Hobbs Act extortion, correct? Correct. And so the question is, are there . . . were those crimes correctly defined by the court in appreciating whether Silver acquired criminal liability as to those subsequent acts, correct? Yeah. I mean, I would say as to . . . And there are two acts. One is a payment that Silver received in referral fees from Weitz and Lutzenberg, the referral having been made prior to . . . during the precluded statute of limitations period, but for which he received payment during the period of time for which he had criminal liability exposure. Right. And the question there is . . . Right. . . . or is it just a continuing gratuity? Taub says, I wanted to keep on good stead with him. Right. And the referral came after . . . That wasn't a referral. Right. That payment you're talking about is not a referral. That is like a tail end of an earlier referral. That's what you're referring to? Yeah. So then . . . So there's that. Right. And then there's the resolution saying Taub's a great guy. Proclamation, yeah. Yeah. So which you've already held the last time around could not support a finding of harmlessness, but . . . It was a pretty lousy call for the quit. But it's even worse than that because, as we point out in our briefs . . . Well, certainly . . . . . . the evidence wouldn't even support finding it to be something. It doesn't . . . because Silver does it without Taub knowing anything about it. It's not in exchange for any payments. It may have been an effort by him to remind Taub he still existed. Your argument then is that the jury charges given allowed the jury, as to the Taub situation, to include the resolution as part of . . . as criminal conduct. It goes well beyond that. My argument is that even for the . . . not just as to specific aspects. For everything, the . . . what the instruction described required the jury to find is not a crime. The crime has to be something . . . the jury has got to be . . . The question of what the evidence shows, which is what we're talking about, is separate from whether the jury here was . . . Is your position that you need to . . . that the government needed to show an agreement as to every official act? No. What is your position then? First of all, it breaks down into two parts here for what the deficiency is. The government, first of all, has to show that the defendant agreed or promised or committed to do something in exchange for the payments. Not merely that he received it with intent to do something. Those are two very different things. The judge focused on intent. Not . . . did not require a promise or commitment as all the cases require. And then the second thing is, okay, on the McDonnell aspect of it, what is it that he has to be promising or undertaking to do? It has to be something that . . . the jury's got to find something that is described at least specifically enough that you can look at it and apply the McDonnell test and determine what he's agreeing to do. In other words, it's not just abstract. So it doesn't have to be the particular act. It can be he is agreeing to provide votes as needed. He's agreeing, let's say somebody controls the awarding of competitive bidding contracts. He's agreeing to award contracts. You don't have to specify. Right. Yeah, but it's got to be . . . it can't just be . . . I mean, it's not a thing agreeing in the abstract to commit official acts as described later on in McDonnell. But I want to get back to something very important about what you were asking about, Judge Wesley, which is the government, in trying to extend this into the limitations period, points to this one payment that he receives from his law firm in, I think, 2010. The problem is that can't work because of what the jury . . . the judge instructed the jury about what they had to find to satisfy the statute. They had to find a . . . on a services side of things, they had to find a mailing or a wire within the statute. And the problem there is that, number one, she said it has to be something that was in their bill of particulars. That thing they're referring to is not in their bill of particulars. So, that is not under the judge's instructions. That is not a basis on which they could have made that finding. Entirely separately, it's also not something that is in furtherance of some continuing offense, but you don't even get to that. On the Hobbs Act, you have to find a receipt of . . . I'm forgetting exactly the word, but basically it's the receipt of property within the limitations period that ties to that. And the property is defined as the referrals, the leads. The property is not . . . again, in her instructions, it is not defined as the long tail end of the payments. So, they can't get there on that. Well, wait, why not? I mean, you could structure your payments over time so that they begin before the act, they continue after the act. I agree to pay you $10,000 a month in perpetuity. That would be enough. Yeah, but the payments, the money here, is not defined by the judge as the species of property that is at issue. The property here that is being extorted is the referral, the lead, as they were calling it. And that's in her instructions, very explicit. You have to find . . . the property being extorted is the lead. So, if then, as a result of that, your law firm is later paying you, what they're paying you is not the property that's being extorted according to her instructions, so that can't save it. You've already got the lead. Yeah. Yeah, you got . . . right. The lead for the stuff that related to what they didn't prosecute him for in a timely fashion was all . . . right. But there are referrals made . . . Before. There are referrals made within the statute of limitations period, right? There are referrals, but there is no suggestion, and certainly the jury wasn't asked to find, that anything within the statute of limitations period related back to . . . in 2006, 2005-2006, and they're trying to extend that into the period. New referrals, after he's definitively said, you're not getting any more grants, are not it. The quid pro quo seems to dissolve, at least around that. The question is what the interpretation is. What was . . . could the jury have found that Silver had an expectation of continuing to do things? And your objection is it's not specific enough. Well, and also, but when we're talking about this, the jury . . . Your first answer is yes, but also? Yeah. Okay. Because the jury . . . you would have to say the jury would be compelled to. We're talking here about harmlessness. I understand. So, right, because of the instructional error. All right. All right. Okay. Well, Mr. Feder, we've kept you past your time, but you've got two minutes for rebuttal. Thank you. We'll hear from Mr. Richenthal. Thank you. You get 150 percent more time as well. Excellent. Good morning. May it please the Court. I'm Assistant U.S. Attorney Daniel Richenthal. I represented the government before the District Court. I represent the government on appeal. I think that I'll start where my adversary left off on the statute of limitations point. And I want to correct the record in a few different ways. So, first, it's not the case, plainly, that Judge Caprone's instruction allowed the jury to convict if the scheme ended. I would direct Your Honor's attention to multiple places, but most specifically, Special Appendix page 35, transcript page 2063, where the District Court, without objection, expressly instructed the jury, it must find an aspect of the crime you're considering occurred after February 19th, 2010. It further instructed that if it doesn't find that, it must acquit Mr. Silver. And it further instructed as to extortion that if it doesn't find money or property received after that date from the scheme, again, it must acquit Mr. Silver. So there's no instructional error here with respect to the statute. Indeed, Mr. Silver doesn't contend otherwise. He just contends the evidence is insufficient, and it's not. I also want to make a point. He objects to the fact that the acts that could be a portion of the crime were kind of open-ended in the sense that there was a retainer theory. That's your words. And so his objection is that the agreement, well, there I go, that the promised performance wasn't specific enough as to what occurred in the post-statute limitations period. I read his objection as having two points, but I want to make a small point on the statute of limitations as well, just to correct the record. It's not the case there's only one payment after February 19th, 2010. There's many payments after February 19th, 2010. There's many referrals. Wait a second. They're all for referrals post the quote reform which precluded the HCRA grants, right? No, Your Honor. They're not. As we tried to indicate with the use of a CEG, which I admit might be a two- Yeah. Well, I'll tell you, we only found one. So if you've got more than one, I'm expecting a 28-J letter where you can tell me where in the record they are. I'm happy to provide more than one. I would just say right now the way to determine this is actually fairly straightforward. You can look at GX1509, which is a summary chart of all referrals from Dr. Taub to Weitz and Luxembourg. It contains on the left-hand column the intake date of the referral. On the right-hand column, the total amount of money Mr. Silva received. You're then able to see when the referrals predated the end of the HCRA grants. And then if you look at the 514 series, which is a series of checks, I don't recall standing here if it's in the joint appendix, you can see that the checks continued for multiple patients or clients. You say that there were referrals that occurred before the termination of the HCRA funding opportunities for payments of which occurred later on within the statute of limitations. Yes. And you're saying there's more than one. There's more than one. It's not every patient. Some cases were over. Some cases weren't over. I don't have the number standing here, but it is multiple patients or clients referred by Dr. Taub before the HCRA grants ended for which Mr. Silva received payment after February 19, 2010, which is relevant to the extortion count. On mail-in wire fraud that is on a services fraud, there are numerous wires after February 19, 2010. There are the ones in the Bill of Particulars, which the jury expressly was told it must find during furtherance of the scheme, and there are plenty of other wires. But let me go back for a second because my point, which I was trying to start with, is that's actually not an instructional claim. They're not contending the district court misinstructed the jury as to the statute of limitations. What I just read on 2063, that's not before this panel. Mr. Sober seems to think that was accurate. Mr. Federer seems to be nodding, but what is the quo for the post-2010 period? Because by then, Silva has instructed Taub that there ain't going to be no more grants, right? That's correct. So what's the quo at that point, future considerations? Well, three things. So one, Dr. Taub described at the very beginning of the scheme what he intended Mr. Silva to do, what he thought Mr. Silva could do over time. He said, and I'm quoting now from Joint Appendix 489, as a legislature, he could help mesothelioma patients in a variety of ways. For example, he could regulate laws relating to asbestos production or use, and particularly asbestos inspections within the state, which were weak at the time. There are a lot of things he could do. I think we all understand that. He was the Speaker of the Assembly. What was the understanding of Mr. Silva after 2010, and what's the evidence for it? The evidence that the understanding is the same is the course of conduct between the two men. So the fact that he got payment is proof that they were official acts that were contemplated? No. What's the proof of official acts? What's the quo? The official acts have to be the quo. Post-2010, post-termination of the grants, what is it that Mr. Silva is expecting that he has to do? He's expecting, and let me back up for one second. There doesn't have to actually be an official act after February 19th, 2010. The panel on the first civil appeal held that, but there, in fact, were at least two. So one is the proclamation that Judge Wesley pointed to, and, in fact, that was very important to Dr. Taub. There was testimony about this in the second trial about how it was framed. He was very proud of it. He talked to people about it. It was a big deal. How did Silva know that it was important to Taub? There's nothing in the record that Taub made Silva aware of the fact that he wanted it done. Because it's very clear, based on the course of conduct between the two men. To be honest with you, I served in the State Assembly. I authored a million of these things for Boy Scouts that got their Eagle Scout Award to the 150th anniversary of the Livonia Methodist Church. I never saw one defeated. But there's a concession that it's an official act. It's a quo, I suppose, and Judge Cabranes, I think, appropriately said it's not much of a quo, but in any event, it's a quo. There's strong quos and weak quos. Right, but what is there in the record that shows that Silva somehow used his position to extort that quo? It's not that he used his position to extort the quo. It's that he used his position to extort property. But to answer Your Honor's question as to why Sheldon Silva would have believed this to be part of the scheme, it goes back to two things. One, the course of conduct between the two men. Sheldon Silva knew what made Dr. Taub tick. And what made Dr. Taub tick was support for mesothelioma and prestige. And he took advantage of that. Right. That proclamation. A lot of that might be meetings. And a lot of that might be the sorts of things that McDonnell says don't count as official acts. They might be really valuable to a guy like Taub. Right. But that doesn't make them official acts. And so what is there that suggests that there were official acts as defined by McDonnell that were part of this equation? Because it sounds to me like what you're saying is that, eh, he might be useful later, Silva understood that he might be useful later, and they'd work it out later. That's pretty squishy. That's not what I'm saying. I'm saying multiple things. First, I'm saying since literally the beginning of the scheme, it was clear to Dr. Taub, whose credibility was not challenged, that he had multiple things in mind, every one of which were official, that he talked to Sheldon Silva about some of those, including clinical trials, that he understood that there was an understanding between the two men that that's why he was being paid. That's from the beginning of the scheme. He said specifically, after Sheldon Silva says he can't do grants anymore, I don't think my understanding changed much. I thought he was incentivized to still be an advocate for mesothelioma patients and research. That particular source of funds seemed not to exist, so that was not an occasion when he could fund us or fund research. In other words, but even if that — there might be some things that could be official acts down the road that affected mesothelioma patients was enough. That's what you're saying. If Sheldon Silva solicits or accepts payment with an understanding that it is designed to influence an official act, as defined under McDonald, even if the opportunity hasn't happened yet under Ganim and Rosen, that's enough. That said, there were, in fact, two official acts. The proclamation is one of them. The proclamation is one, but it's not the only one. But it's uncontested that that is an official act. It's uncontested as an official act, and the timing here is incredibly telling. It didn't come out of nowhere. Dr. Taub went to Sheldon Silva after the statute of limitations period begins, which is to say after February 19, 2010. Right. Sheldon Silva shows up in his office unannounced, and he says in so many words, why are the referrals dropping? Now, if Mr. Silva is right and the scheme is over, that question makes no sense, but he says, why are the referrals dropping? And Dr. Taub gives a very blunt answer. He says in so many words, I've gotten more than $3 million from another law firm called the Simmons Law Firm. And Sheldon Silva is not very happy about that. And Sheldon Silva springs into action. And that winter, there's an American Cancer Society dinner, and a Simmons firm is sponsoring Dr. Taub, sponsoring a table. And a reasonable jury was more than entitled to infer. Sheldon Silva got really nervous. The drop was going to continue. So what did he do? He sprung into action and pushes the proclamation through, using multiple of his staff members on an expedited basis. What happens after that? What happens after that, as I think Your Honor knows, is the permits. That is miles from Meso to Charity Race. It was going to be around the former Twin Towers. And Dr. Taub says, I can go to Sheldon Silva. This is in the record. It's actually in the joint appendix. But it's going to cost me. He'll fulfill his deal, but he's going to expect some recompense. That's a direct quote. And he goes to Sheldon Silva. He also directs a woman named Joy Wheeler to Sheldon Silva. And Sheldon Silva agrees to help. And Dr. Taub understands his help is not, at least in Dr. Taub's view, because Sheldon Silva believes miles from Meso is a good thing. It's because Dr. Taub's asking. Dr. Taub. Wait, what does his help do? He tells, I mean, as far as I understood it, he explained or had somebody explain how you get a permit. You make a decision about the permit. He met with the people who wanted to organize the charity race, and he agreed to help them get the permit. That's a meeting, right? That's the sort of thing McDonald says doesn't count as an official act. Without more? Absolutely. And the district court instructed the jury accordingly. But Sheldon Silva agreed in that meeting and after that meeting to help with the permits. Dr. Taub understood that to be, use his official power. He said, and this is GX 525-17, this is contemporaneously. This is an email to the people he's talking with about the charity race. I added a line to the letter to Shelly Silver. If he delivers, I am sure it will cost me. Now, he was asked why did he think that. And he answered, because, as I mentioned before, I thought the basis of the relationship between us had to do with the referrals, and the referrals were key. And I felt that it was his opinion that if he did something, he would expect some recompense. That's Joint Appendix 524. The problem is the did something. The something is not necessarily official acts. The something sounds like lots of the things that McDonald says aren't official acts. And if somebody wants to pay money for that, it's not good, but it's not a crime, right? I certainly agree that if Dr. Taub and Sheldon Silva had an implicit agreement, which they did, in which Dr. Taub would refer cases to Weitz and Luxembourg and Sheldon Silva would take only unofficial acts, we shouldn't just get vacateur. We should get reversal, at least as to the asbestos case. But that's not what happened here. I want to go back to the beginning of the scheme, because, again, the jury's properly instructed it must find the scheme continues. So let's talk about how the scheme starts, because our view, as Your Honors knows, is the scheme didn't end until the men were arrested. How does it start? Dr. Taub says to Sheldon Silva, in so many words, I want you to give money to MARF, the Mesothelioma Applied Resource Foundation, M-A-R-F. And Sheldon Silva says, I can't do that. Then he sends a secret message through his friend, Daniel Schill, and the message is very precise. The message is Shelley wants cases. I don't think we're disputing about the pre-2010 period. The issue is what is there for post-2010. We've got a proclamation and we've got help with a permit. That's it? Well, there are other things that happen then, but there are . . . What other official acts? I thought you said there were other official acts. I don't think there's other official acts that occur after February 19, 2010, but there need not be. The question for the jury, which was properly structured on this point, is did the scheme continue, the scheme of trading referrals for official action? The answer is yes. We have at least two official acts, or even if Your Honor wants to say the permit doesn't count, we have at least one, and we have this ongoing relationship for a decade between two men. Dr. Taub is no dummy, and Dr. Taub testifies time and again, including on cross-examination, my understanding didn't change. Our relationship was the same. The referrals were the key. I thought he'd be in an opportunity to give . . . he'd be in a position to give funding again. That source of funding wasn't there. That is . . . Must be something specific and focused that is pending or may by law be brought before any public official. This doesn't sound very specific to me. I'm not sure I followed Your Honor's . . . That's McDonald. No, of course, but I guess I would respond as follows. If two men, here Dr. Taub and Sheldon Silver, enter into an agreement in which the first man is going to give referrals, which are worth millions of dollars, to the second man . . . In exchange for grants, and then the grants dry up, but the payment, the referrals continue, then it must be that they substituted new official acts. That's what you're saying. It doesn't have to be, but the question is could a reasonable jury find it, and the answer is yes for multiple reasons. One, from the beginning of the scheme, Dr. Taub was clear, and again, his credibility wasn't challenged intentionally, that he didn't believe the understanding was limited to grants. He talked about a series of things, and he talked to Sheldon Silver about those things. So, I just respectfully disagree that . . . Those things are things that would be official acts? It's what I quoted before. It's . . . Then . . . Yes. But that's still dependent upon, I mean, to follow up on what Judge Sullivan is asking, that's dependent upon whether it can be open-ended, or whether there's a need for more specificity, or should I say particularity. It would be one thing if you said . . . because it seems to me it's kind of undefined here. The problem is you talk about Taub's pressing for a continued relationship, because eventually something good might come up. But, I don't think . . . is that enough? And, I don't think that Gammon stands for that. And, I was there. So, I mean, Gammon was particularized and identified with regard to kickbacks and contracts. And, you know, the mayor was gleeful about how he was going to be able to manipulate his position. But this is . . . I don't understand. Doesn't this get very close to the line of the danger of just currying good favor? Isn't that exactly what Taub was doing? Well, no, for multiple reasons. So, first, let me just separate out two points for a second, because I think that they're getting conflated, and the fault may be mine. So, with respect to the facts, this is a sufficiency challenge. Your Honors may disagree with where the jury came out, but drawing all inferences in the government's favor,  Oh, multiple official things. Was there talk about legislation? Yes. What's the legislation? Again, it isn't specific in advance, because it hasn't yet arisen. But, Dr. Taub is very, very clear, Joint Appendix 489, that one of the things he intended when he paid these referrals was for Sheldon Silver to influence legislation to support research. What's the evidence that Sheldon Silver had that view? I mean, there's sort of a tension here, right? Because you're arguing that the bribe-or's intent, there doesn't need to be an agreement, but you're proving up Silver's intent through Taub's understanding. But was there a discussion about this? So, two answers. One is, it's not intention, never mind mutually exclusive, to prove a second person's intent by asking a person who interacted with that person over years, what did you think you had an understanding about? And what was the basis for that understanding? And all of that was explored at trial extensively, and Dr. Taub repeatedly was questioned, when did the understanding come about, what was the understanding? His credibility wasn't challenged, and those were his answers. Here's the danger. I'm sorry. Go ahead and finish your answer. I apologize for doing that to you. Go ahead and finish your answer. But beyond Dr. Taub's testimony, which the jury was more than entitled to credit, indeed it wasn't challenged, you have Sheldon Silver's actions. When the referrals drop, he springs into action. Now, we concede some of those actions aren't official, and some are. Between Dr. Taub's testimony, Dr. Taub's contemporaneous emails with people talking about it's going to cost me, Dr. Taub's discussions with people about, we'll go to Sheldon Silver, he'll get the permits for us, but I'll have to give him more referrals, and Sheldon Silver's actions when the referrals drop, a reasonable jury, properly instructed as this was. A combination of those two, right? It's timing. This is what I wanted. I wanted legislation, and you get a proclamation. It's not just meetings. It's concrete acts. Yes. That's the argument of these. Absolutely, but also because there need not actually be an official act within the statute of limitations.  The jury doesn't have to have agreed the proclamation was official. That's because the court accepted the idea that you didn't have to identify anything specific or particularized. In a sense, not a bill number, but an area. Let me ask you this. Let me ask you this. Differentiate this for me. A lot of campaign contributors expect that if you take the money, you'll vote favorably for them. Believe me, I can tell you that from personal experience 32 years ago. The National Rifle Association gives you money, and you vote no on something that they want a yes vote on. You will hear from them, and you may not get their money again. If you vote yes the next time after you've taken NRA money, have you committed a crime? No. Why? Well, you haven't committed a crime because the time you accepted the money, you didn't have the requisite corrupt intent. I had a clear understanding that the NRA gave me the money with the understanding that I would vote yes on anything pro-NRA, that I would vote as the NRA expected, and that's the nature of politics, sir. Well, I think there's – I have two responses. One, under McCormick, you need – People don't just give you money to be your friend. Believe me, I can tell you that from four years in the legislature. No, I accept that, and I want to give you a multiple answer. So one is under McCormick, there has to be an express or explicit exchange. How about the word specific? So here's the answer on specific. Express or implicit refers to how it's conveyed. Specific is a far more appropriate word, I would think. Yes, and I want – Because it separates the campaign contribution from the corrupt intent. Yes, and there's no question here. Okay. Even Sheldon Silver, I think, doesn't dispute this, that when Judge Caproni talked about it as opportunities arise, she tied it to official act, literally in the same sentence. If Your Honors accept, as you should, it's been the law for decades, that a stream of benefits or retainer theory is the law. Yes, specific opportunities arose. Arose. Now, what's the specificity of that? Because what she's talking about, and I think, is Your Honor looking at special appendix 30, that is the honest services charge? Yeah, yeah. She says official action for the benefit of the payor, and this is the key part that I was getting about sort of after versus – and at the time the bribe was accepted, intended to do so as specific opportunities arose. In other words, intended to take official action as specific opportunities arose. That is a correct statement of law. Mr. Silver's also making a sufficiency challenge. We'll have to decide whether that's a correct statement of the law. Of course. But it comports with Rosen, it comports with Ganim. Indeed, it comports with McDonald. I mean, McDonald itself, literally the McDonald case itself had an as opportunities arise. Do you think that someone can be on a retainer? I mean, because you're the one who used the word retainer theory on a couple of occasions. Could someone be on a retainer so that they pay you a series of fees or campaign contributions, or because legislators in New York are allowed to have outside incomes, that they'll make referrals that benefit them through that outside income? Can they be on retainer without any specific promise about – that maybe there will be a bill later on with regard to sales tax exemptions, or maybe with regard to rolling stock for refurbishment of railroad cars, or maybe they'll come up with a bill that concerns themselves with regard to reform of the labor law because they also have a construction company. So that's favorable to them personally. Can it be that general in your view and still be criminal? I think it's hard to answer without more, and here's why. If a legislator – Well, let me give you a specific example then. A company has interests in construction, railroad refurbishment, a number of different types of things, and they go to the legislator and they say, you know what, we'll start using your law firm because we know you've got a nice arrangement with that law firm, and you get a portion of all the fees with that law firm, but we'll continue to use it. But when a bill comes up that affects us and we say to you, we'd like you to vote our way, you'll vote that way. Is that specific enough? Yes. Okay. And that's because a bill is official action, and in Your Honor's hypo, as I understand – A violation of 201. Yes. It's also on a services fraud bribery, and it's also almost certainly extortion under the Evans standard. But I also want to make a point here. I think both my adversary and I think Your Honor implicit in the question suggested there's a concern here, generally as opportunities arise, that it may be the person accepts money on, say, day one and takes action on, say, day 246. And – I don't have the problem with the fact that it might be future. I have the problem with the fact that I think it need be specific, not that it need be particularized in some way to have an appreciation of the fact of what's expected. And I agree with that, and that's what the jury was instructed. The jury was told official action as opportunities arise. Now there's the question of was there sufficient evidence of it, and I'm happy to talk about it. But that's – Is anybody going to talk about the real estate deal? I mean, I'm surprised – I'm happy to. Before I transition, let me just add one point to my answer earlier that I inadvertently neglected to add about Mr. Silver's intent and why the panel should be confident Mr. Silver understood what was going on. And that's because of what he did when Dr. Taub was approached. This is the asbestos scheme by law enforcement. And Dr. Taub tells Mr. Silver, I was asked about referrals. He's very precise. And Silver asks back, did you tell the agents anything? That question is only reasonably understood if Sheldon Silver is conscious of guilt. He's conscious of the nature of their corrupt relationship they've had for a decade. At pre-McDonnell, I don't know about that. He might feel really guilty about unofficial acts and about influence, selling influence. That looks terrible. It'll be ugly. And pre-McDonnell, it might have been criminal. But it's not criminal if that's all it is, right? If all he did was unofficial acts, again, absolutely. But my question is. But that statement is still consistent with him feeling uncomfortable about unofficial acts. So I wouldn't put too much stock into that. Talk about the other scheme. The real estate scheme. Right. There's no statute of limitations problem with that one, right? No. Okay. And so I'm surprised you just didn't lead with that one then. So are you running away from that one for some reason? I'm responding to the back and forth with my adversary. We're not running away from the real estate scheme. Not anymore it's your time. I'm actually well over my time, I think. No, look, I'm happy to answer any questions the Court may have on the real estate scheme. I mean, again, the back and forth here is actually pretty similar, which is we don't have an explicit promise in return for official action. After McCormick, we don't need that. But we have statements and timing that is indicative of what's happening. So let me just give a small point, especially because it's in the reply brief. Time and again, after Sheldon Silver takes official action, unquestionably official action, legislative action, public authorities control board action, to benefit Glenwood, Glenwood steers more cases to Gerrith or Goldberg. It is not the case that it steadily increased over time irrespective of dates, irrespective of actions. 2007, Gerrith or Goldberg's firm has six properties. When I say properties, I mean BBL, building, block, and lot, which is how this is done. The word buildings is something of a misnomer. 2007, 421A is renewed. 2008, Gerrith or Goldberg's firm goes up to 16. This work is interchangeable, and the uncontested evidence at trial is Glenwood literally took it away from other law firms and gave it to Goldberg without any reason. So he gets 10 more. He's more than doubled within months. 2011, he still only has 16. That hasn't steadily increased. He's got the exact same number. But what happens in 2011? The property that's extorted at that point in time is simply the favor to Goldberg because at that point in time, the relationship between Silver and Goldberg is not disclosed to the payor, right? Until January 2012. That's correct. But I would phrase it differently because there's plenty of precedent that extorted property need not go directly to the extorter. No, I understand that, but I'm just trying to understand. I mean, the fact that they don't know that Silver is benefiting himself you say is irrelevant. They know that doing business with Goldberg pleases Silver, and that's the extortion. Is that it? They know that Sheldon Silver has asked them to steer business to his friend, and they know that at least until December 2011. And they act accordingly. That's the point I was making. 2011, he's got the same number of properties. 2012, and between those two moments, what happens? They have a private meeting with Glenwood's chief lobbyist. Glenwood's chief lobbyist tells Mr. Silver what they want, which is not what the real estate industry generally wants. That was discussed extensively at trial. Sheldon Silver supports that bill. That bill is passed. And what happens? Yeah, what happens again? Remember, he jumped up earlier when 421A is renewed. He jumps up again. He goes from 16 to 22. He gets six more properties. And that's just a piece of what's happening. Time and again, the actions and the referrals or payments are linked. And a rational jury is more than entitled to consider that until December 2011 they didn't know that, by which I mean they only knew they were paying his friend. Totally fair game came up in closing. But after January 2012, they absolutely know. And they go to Sheldon Silver and they say, we're going to keep paying, but we have to do it the secret way. He signs a side letter on a street corner in front of double-parked cars in lower Manhattan, and they bury the letter. They don't just not give it to the vice president of finance. They don't put it in the file. Thank you very much. Mr. Federer. So I think I'd like to start with a bit about what Dr. Taub was expecting when he was making referrals after the grants stopped, because I think that it really helps to illustrate why the instructional error was so damaging here. The government says, explains, and this is true, to ask Dr. Taub, okay, after you're not getting grants anymore, why are you making referrals? And he says, well, I want the relationship. There are other things that he might be able to do for meso patients, and, you know, some of which, as he describes, could have been official acts. But the part that's left out is, did Sheldon Silver promise or commit to do any of those things? Can I ask you just a broad question about this? So my sense is that really the instructional error, I mean, maybe there's a disagreement about this, but the instructional error, you think, infects everything. And that's really the beginning and, in one sense, the end. If we were to disagree with you about that and determine that Judge Caproni appropriately instructed the jury, without requiring, obviously, an explicit or implicit agreement and so on, then what? Well, I think that, you know, for the reasons that we've discussed, that we've made, first of all, there's also separately an error in how there are two problems in the instructions. The other is on the McDonnell official acts component of it. Do you agree, or there is some agreement, that the proclamation, and this is sort of to the statute of limitations, but at least the proclamation, whether it's strong or weak or it doesn't really matter, is an official act? Right. But, of course, we have no way of knowing that that was the official act that the jury found, right? There's no special verdict here. There's no special verdict. What are we to draw from that? So what we've got is, look, on appeal, we view everything in the light most favorable to the government. We have an official act that, by agreement, is an official act after the statute of limitations expires. But you have, but you actually, you do view the evidence in the light most favorable to the defendant. But when you have instructions that permit the jury to convict the defendant for conduct that is not, does not make out the crime. No, no, no. And there's also one thing. Let's just assume that we disagree with you about the instructional error. Including the official, no, but what about the official act instruction, which is also improper, because it gives the jury this notion of, doesn't require them to identify what's actually agreed to and determine that it's official. Just says you can determine that there's this abstract, and by the way, we're saying agreement. It's actually intent, right? Because she avoids agreement. So, actually, there's all sorts of things that they could have used as the basis for a conviction that wouldn't work. Did you ask for a special verdict? Not you, but. I don't, I don't believe we did, but I don't think a special verdict is required where you have all these things that would be insufficient. And, plus, I'm forgetting one other thing. That's an official act, but the evidence is insufficient on that for separate reasons. Because by the government's own account, that wasn't something he did in exchange for something that Dr. Tabb gave him. That was his effort, right? Dr. Tabb didn't ask for it. It wasn't part of any, right? This original hypothetical that, you know, if you give me money and I sort of engage in some official act. It's the other way around. No, no, no, but it's the other way around. The hypothetical here would be if Mr. Silver goes, he's like, I need to get back on this guy's radar screen. Maybe if I do this for him, you know, he'll remember me fondly. That's like, well, whether you want to call it a loss leader or what, I don't know. But that's not something that's in exchange for something that was, the language, again, is in return for. But, again, like I think very important here to this. You have an expectation that, and your opponent points out rightfully so, that Silver went and complained about the decline in the referrals. But complaining about, I mean, part of the problem here is the government treats this whole thing as though. Something he didn't have an expectation of receiving. Wait a minute, you might complain about not getting the same dollars you got from the NRA last term, right? Right. People might complain about all those things. Right. The crime is not soliciting someone to give you stuff. The crime is exchanging something for it, promising to do something in return. And that's why, again, like why the difference between just saying in his heart of hearts when he received the money he intended to do something is not sufficient and you would need. So, like when Dr. Taub says there are a lot of things he could have done, there's only a crime if Sheldon Silver says or conveys. The jury, it doesn't have to be expressed, right? But the jury has got to find that he actually promised or agreed to do something or did something in exchange. That Dr. Taub was giving it to him in the hope is not the crime. He has to, and this goes back to McCormick and straight through from there, that's what divides this from, as Judge Wesley is saying, situations where, and McDonough warns of much the same thing. There are lots of things that public officials may do for people who are benefactors or supporters. It becomes a crime when you agree to exchange this for that. Receiving it and then saying without any way, without the jury being required to find anything was committed in return is not the crime. Last thing that- I mean, I would like you to get to the real estate fraud. Thank you, Your Honor, if I may. On the real estate, first of all, again, I mean, here it's even more stark, I think, that there is absolutely nothing that in this fact pattern that, I mean, again, I'm going to skip past the instructional error on not requiring an agreement. Although, again, I mean, very important here because all of the government's witnesses say, we had no agreement with him. We didn't ask him for this. In return, we didn't expect it in return, right? Okay. You'll skip past that. Having now, there's a Latin term for that form of, that slips my mind at the moment. But, yeah. Is it paralepsis, maybe? Anyway. So, there is nothing that distinguishes anything that happens on the real estate side from a situation where they are doing what all the government's witnesses said they were doing, which is, he's a powerful guy. We want to stay on his good side. We're not getting anything in particular in return. We're not asking for anything in particular in return. There is nothing that distinguishes what happened here from it being exactly that. There is no evidence that he ever was asked to do anything in particular in return, that he agreed to anything in return. If he met with the lobbyists, though, then their interest became specific, didn't it? Well, except that, two things. One is, yeah, he met with the lobbyists, but, I mean, as a million cases have said, I mean, one thing, when people pay to cultivate a relationship, part of that is that they're looking to have access so that they can have a meeting when they want it. McDonald is only the most recent. The question is, though, is there evidence that Silver then either commits to do anything for them or does anything different than, like, there's a good contrast to a case like Rosen, where a lot of the evidence is that these people are getting these consulting fees, and then they are doing things that are different, for the most part, from what they might otherwise be doing in order to help the person paying them. But that's not required, right? I mean, it might be that he might vote this way anyway, but he's promised that he's going to deliver the vote, even if he might have gotten there anyway, right? Yes, but, and it's an important but. That is true if there is independently evidence of his agreeing to do something. It's no defense to say I would have done it anyway. The reason it's different here is there isn't any evidence. The government is asking you to infer from the fact that he didn't shoot down their, you know, PCAB rubber stamp things that there is an agreement, right? So there's no independent evidence that anyone ever discussed that or that he agreed to do that or ever focused on it. The, you know, rent legislation passes, what is it, 100 and whatever to 30. There's no, they say, well, the legislation ended up being something that they were satisfied with, but there's no evidence that he does anything to make it come out their way. They were just asking you to infer from the fact that it's like, basically, it's receiving benefits while Speaker, in their theory, is enough for, and. The NRA, almost the NRA. And right. And again, you have the instruction not saying you got to find an agreement and the government arguing, not only reinforcing that, but saying. They don't defend it. I think they agree it's would now agree it's incorrect. If at the time silver takes action, not at the time that he receives the benefit. Right. If at the time he takes action, he has anywhere in his mind that he's received benefits. Imagine the NRA. Right. That that's the crime. That's repeatedly. Thank you very much. Thank you. I'll ask the government. Does the government still oppose bail on appeal? Thank you. Well, reserve decision. Very well argued on both sides.